UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALLIANT, LLC, a Wyoming limited liability company, | Case No. 1:25-cv-00143-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| JOHN "ESTY" McCOY, an individual; FLUID CHARGE, LLC, a Dissolved Maryland limited liability company; LEESBURG PIKE PARTNERS, LLC (MARYLAND), a Maryland limited liability company; ZACH LAPOLE, an individual; GAGE EVANS, an individual; CHRISTY MILTON, an individual; and TRACER PAYMENTS, LLC, a Texas limited liability company, | |
| Defendants. | |

## INTRODUCTION

Before the Court are defendants' motions to dismiss for lack of personal jurisdiction. *See* Dkts. 26, 27, 28, 38. For the reasons explained below, the Court will grant the motions and dismiss plaintiff's claims without prejudice.

## BACKGROUND

### A.    The Parties

Plaintiff Alliant, LLC is a Wyoming limited liability company with its

headquarters and principal place of business in Boise, Idaho. Alliant has offices in Idaho, Washington, and Virginia and its sole member is Michael Eisenman, an Idaho resident. The defendants include four individuals, John "Esty" McCoy, Gage Evans, Zach Lapole, and Christy Milton, and three entities, Fluid Charge, LLC, a dissolved Maryland limited liability company, Leesburg Pike Partners LLC (Maryland), a Maryland limited liability company, and Tracer Payments, LLC, a Texas limited liability company. McCoy resides in Maryland; Evans and Lapole reside in West Virginia; and Milton resides in Texas. Milton is the sole member of Tracer Payments, LLC. McCoy was the sole member of Fluid Charge, LLC and is the sole member of Leesburg Pike Partners LLC (Maryland).

The parties are involved in the payment processing industry, which Alliant describes as "a complex network of business entities working to facilitate debit card, credit card, and other electronic payment transactions between consumers, businesses, payment processors, and financial institutions." *Compl.* ¶ 27, Dkt. 1.

## B.    Former Alliant Employees McCoy, Evans, and Lapole

McCoy's involvement in this industry dates back to 2003, when he began working in the Virginia office of Monk and Mann Ventures, LLC, which did business under the name of Alliant Merchant Services. McCoy continued with Monk and Mann until 2010, when he began working for Leesburg Pike Partners ("LPP"), which, at the time, was a Texas-based limited liability company doing

business as Alliant Merchant Services. McCoy worked in Virginia, serving as the

general manager of LPP's Virginia operations through November 2013. *See*

*McCoy Dec.* ¶¶ 3-8, Dkt. 26-2. At around that time, Plaintiff Alliant acquired LPP,[1]

and McCoy transitioned to working for Alliant. After Alliant acquired LPP,

McCoy "never signed any employment, confidentiality, non-compete, or any other

type of agreement as a condition of [his] continued employment with Alliant, now

under Mr. Eisenman's ownership." *Id.* ¶ 9. Rather, his employment simply

continued as before; he remained the general manager of Alliant's Virginia office.

While employed by Alliant, McCoy hired and supervised his son, Defendant

Gage Evans, and his son's best friend, Defendant Zach Lapole.[2] Like McCoy,

Evans and Lapole were hired to work in Alliant's Virginia office. Throughout their

employment, all three attended annual work retreats in Boise, Idaho. These retreats

typically involved a work-related training on Friday, followed by a team social

event and company picnic on Saturday. *See McCoy Dec*. ¶ 11, Dkt. 26-2.

---

[1] The history behind that acquisition is as follows: (1) In October 2000, Michael
Eisenman formed Bancard USA, LLC, a Washington limited liability company. (2) Nearly 10
years later, in April 2010, Eisenman founded Premier Payments, LLC, a Nevada limited liability
company. (3) In October 2013, Premier Payments purchased LPP. (3) Bancard USA, LLC
changed its name to Alliant, LLC, and Premier Payments assigned its rights in LPP to Alliant,
LLC. *See Compl.* ¶¶ 32-38, Dkt. 1.

[2] Evans was hired in January 2014; LaPole was hired in April 2019. *See Evans Dec.* ¶ 3,
Dkt. 27-2; *Lapole Dec.* ¶ 4, Dkt. 28-2.

C.      **The Alleged Wrongdoing and The Terminations**

In June 2024, Alliant fired McCoy, Evans, and Lapole. Alliant alleges that McCoy "engaged in a persistent and continuous pattern of misconduct," including embezzlement, interference with existing and prospective customers, and misappropriation of trade secrets. *Id.* ¶¶ 45-46. Evans and Lapole allegedly knew of and assisted McCoy's misconduct and independently breached fiduciary duties owed to Alliant. *Compl.* ¶¶ 44, 124-26, Dkt. 1.

*Embezzlement & Related Misconduct.* The specifics regarding McCoy's embezzlement and related financial misconduct include allegations that he stole residuals from an entity known as TRX, exercised wrongful dominion over and misused funds in two Virginia bank accounts belonging to Alliant, and miscoded personal expenses as business expenses.

Beginning with the TRX residuals, during and after his employment with Alliant, McCoy allegedly diverted residual payments from TRX and another Alliant business partner to accounts that he or Defendant Fluid Charge, LLC controlled.[3] Alliant describes TRX as "a payment processing vendor of LPP's that provides technology and infrastructure for processing credit card transactions and managing merchant accounts." *Id.* ¶ 50.

---

[3] Fluid Charge, LLC, is a Maryland limited liability company that McCoy formed in 2021 and dissolved in 2023. *McCoy Dec.* ¶ 15, Dkt. 26-2.

As for the bank accounts, Alliant explains that LPP had established two accounts at Atlantic Union Bank for its Virginia operations ("the LPP Accounts"). After Alliant acquired these accounts, they remained in LPP's name. McCoy was the sole signer on the accounts, and he directed TRX residuals (as well as other monies meant for Alliant) into the LPP Accounts. McCoy also used funds in the LPP accounts to pay for personal expenses. In that regard, Alliant says McCoy regularly coded thousands of dollars' worth of personal expenses as business expenses. McCoy "turned off access for Alliant's bookkeepers and personnel to the LPP Accounts so that Alliant was unable to see Esty's improper activities and theft of accounts and funds." *Id.* ¶ 75.

**Interference with Customers.** McCoy also allegedly diverted Alliant customers to himself. Alliant says this misconduct dates back to at least 2021, when McCoy diverted existing and prospective Alliant customers to Integrated Payment Processing, which is an independent sales organization that had a direct arrangement with McCoy and/or Fluid Charge. *Id.* ¶¶ 72-73. Customers diverted in this manner include Criswell automobile dealerships located in Maryland or Virginia. McCoy acknowledges forming Fluid Charge in 2021 to service "Criswell Car Dealership." *McCoy Dec.* ¶¶ 15-17, Dkt. 26-2.

**Misappropriation of Trade Secrets.** Alliant generally alleges that McCoy, Lapole and Evans wrongfully used and disclosed "Alliant Proprietary

Information." The complaint defines this term to include "confidential and proprietary information and trade secrets including but not limited to its customers lists, vendor lists, third-party agent lists, and business terms between Alliant and each of those groups." *Compl.* ¶ 112, Dkt. 1. Elsewhere, Alliant uses this defined term to describe its trade secrets, alleging that it owns "valuable trade secrets, *i.e., the Alliant Proprietary Information,* including customer lists, customer contact information, contracts with merchants and others, billing business methodology, and other confidential information which derive independent economic value from not being generally known and are subject to reasonable measures to maintain their secrecy." *Id.* ¶ 130 (emphasis added).

> ***Failure to Repay Loan; Fraudulent Inducement***. In addition to the above misconduct, Alliant alleges that McCoy failed to repay a $103,000 loan. McCoy represented that he needed the money for a down payment on a home, which would be able to generate income related to events in nearby Annapolis, Maryland. Alliant alternatively alleges that McCoy fraudulently induced it to lend this money to him.

## D.    Post-Termination Conduct

McCoy, Lapole, and Evans allegedly continued their wrongdoing after they were fired. Alliant says that immediately after their June 2024 terminations, each began working for an entity competing with or seeking to compete with Alliant.

Alliant does not provide details regarding Evans. But it says that McCoy formed a new LLC—Defendant LPP Maryland—which is "indistinguishable from LPP (Virginia), the entity owned by Eisenman." *Compl.* ¶ 94, Dkt. 1. McCoy allegedly "continues to take wrongful actions, steal Alliant's funds and interfere with Alliant's business relationships." *Id.* ¶ 82.

Lapole began working for Defendant Tracer Payments, LLC and has allegedly delivered "Alliant Proprietary Information" to Tracer, in violation of his written agreement with Alliant. *Id.* ¶ 114. Individual Defendant Christy Milton—Tracer's sole member—solicited Lapole to work for Tracer.[4] Alliant says Lapole has directly or indirectly assisted Tracer and Milton in soliciting Alliant's customers and moving their payment processing services to Tracer.

Around five months after he began working for Tracer, Lapole received a cease-and-desist letter from Alliant, informing him that he had materially breached the terms of his written agreements with Alliant, including a Non-Competition and Disclosure Agreement. *See Lapole Dec.* ¶ 8, Ex. A thereto, Dkt. 28-2. The cease-and-desist letter stated that as a result of his "ongoing collusion" with Milton and Tracer, Lapole had "solicited and caused the termination of Alliant's business

---

[4] Tracer has a history with Alliant: In 2013, Tracer and CenPos Direct, LLC entered into an "Independent Associate Agreement." *See* Dkt. 39-2. Alliant later assumed CenPos's rights and obligations under the agreement. That agreement is discussed further below.

relationship with several merchants . . . ." *Ex. A to Lapole Dec.* Dkt. 28-2, at 3.

After receiving this letter, Lapole sued Alliant in King County Superior Court in Washington State, seeking a declaration that Alliant could not properly enforce the non-competition covenants contained in the Non-Competition Agreement. *See Ex. C to Lapole Dec.,* Dkt. 28-2. Lapole sued in Washington because the Non-Competition Agreement he signed contains a Washington choice-of-law and forum-selection clause. *See Ex. B to Lapole Dec.* § 8(g), Dkt. 28-2. That action remains pending.

**E.    The Lawsuit**

In March 2025, Alliant filed this lawsuit, alleging the following 12 claims:

| No. | Claim | Defendant(s) |
|---|---|---|
| 1 | Conversion | McCoy, Fluid Charge |
| 2 | Breach of Fiduciary Duties | McCoy, Lapole, Evans |
| 3 | Misappropriation of Trade Secrets – Idaho | McCoy, Lapole, Evans, Tracer, Milton |
| 4 | Misappropriation of Trade Secrets – Maryland | McCoy |
| 5 | Misappropriation of Trade Secrets – Federal | McCoy, Lapole, Evans, Tracer, Milton |
| 6 | Breach of Implied Contract | McCoy |
| 7 | Fraudulent Inducement | McCoy |
| 8 | Fraud | McCoy |
| 9 | Unjust Enrichment | All defendants |
| 10 | Intentional Interference with Contracts | All defendants |
| 11 | Intentional Interference with Prospective Business Expectancy | All defendants |
| 12 | Civil Conspiracy | All defendants |

All defendants have moved to dismiss for lack of personal jurisdiction.

## LEGAL STANDARD

When a defendant moves to dismiss a case pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the exercise of personal jurisdiction is appropriate. *See, e.g., Herbal Brands, Inc. v. Photoplaza, Inc.,* 72 F.4th 1085 (9th Cir. 2023). "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). But because Idaho's long-arm statute—Idaho Code § 5-514—would permit broader jurisdiction than that authorized under the Due Process Clause of the Fourteenth Amendment, the Court need only look to the Due Process Clause to determine personal jurisdiction.[5] *Wells Cargo, Inc. v. Transport Ins. Co*., 676 F. Supp. 2d 1114, 1119 (D. Idaho 2009). "Thus, under Idaho law, the jurisdictional analysis and the federal due process analysis are the same." *Id.*

---

[5] Alliant argues that the Court should look to state law—and specifically to language set forth in Idaho Code § 5-514—to determine whether it has jurisdiction. *See Alliant Response,* Dkt. 30, at 3-8; *Alliant Response,* Dkt. 39, at 3, 5-7. But as this Court has previously explained, "[b]ecause Idaho's long-arm statute, codified in Idaho Code § 5-514, allows a broader application of personal jurisdiction than the Due Process Clause, *the Court need look only to the Due Process Clause to determine personal jurisdiction.*" *Wells Cargo,* 676 F. Supp. 2d at 1119 (emphasis added). Indeed, in at least two cases, the Idaho Supreme Court has held that although the defendant's conduct fell within Idaho Code § 5-514, jurisdiction could not be exercised consistently with the Due Process Clause. *See id.* (citing *Smalley v. Kaiser*, 950 P.2d 1248 (Idaho 1997) and *St. Alphonsus v. Washington,* 852 P.2d 491 (Idaho 1993)). The net result is that if jurisdiction cannot be exercised consistently with the Due Process Clause, this Court lacks jurisdiction—even if Idaho Code § 5-514 is otherwise satisfied.

Where, as here, a defendant's motion to dismiss is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts" to avoid dismissal. *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990). And the Court must take the plaintiff's uncontroverted allegations as true and resolve factual disputes in affidavits in plaintiff's favor. If, however, the defendants offer evidence supporting their motion to dismiss, the plaintiff may not simply rest on the bare allegations of its complaint. Rather, the plaintiff must then "come forward with facts, by affidavit or otherwise, in response to [Defendants'] version of the facts." *Zach Porter Investments, LLC v. Reiss Technology Corp.*, 748 F. Supp. 3d 950, 960 (D. Idaho 2024).

## ANALYSIS

### A.     The Due Process Clause and Personal Jurisdiction

As just explained, the Court looks to due process jurisprudence to determine personal jurisdiction. The exercise of personal jurisdiction over a defendant comports with due process if the defendant "has 'certain minimum contacts' with the relevant forum such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006) (*quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Sufficient minimum contacts can result in general or specific jurisdiction. *Schwarzenegger v. Fred Martin Motor*

*Co.*, 374 F.3d 797, 801 (9th Cir. 2004). Here, Alliant concedes that the defendants are  not subject to general personal jurisdiction, so the Court considers only whether defendants are subject to specific personal jurisdiction in Idaho. Broadly speaking, specific jurisdiction grows out of "'the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775 (1984)).

The Ninth Circuit uses a three-prong test to determine whether a defendant has sufficient minimum contacts for the exercise of specific personal jurisdiction:

(1)     The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2)     the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3)     the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802. The plaintiff bears the burden of satisfying the first two prongs of this test. *Id.* "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id*. "On the other hand, if the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable." *Menken v. Emm*, 503 F.3d 1050, 1057 (9th

Cir. 2007) (cleaned up). "All three prongs must be met to exercise personal jurisdiction over the defendant." *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023). Finally, although the purposeful direction test is typically used for tort cases and purposeful availment is typically used in contract cases, the Ninth Circuit has recently noted that personal jurisdiction can be found by either purposeful direction, purposeful availment, or "some combination thereof." *Id.*

## B.    The McCoy Defendants' Motion to Dismiss

The Court will analyze personal jurisdiction on a claim-by-claim, defendant-by-defendant basis, beginning with the tort claims alleged against McCoy, Fluid Charge, and LPP Maryland. These three defendants are sometimes collectively referred to as "the McCoy Defendants."

### 1.  The Tort Claims

Alliant alleges a variety of tort claims against some or all of the McCoy Defendants, including conversion, breach of fiduciary duty, misappropriation of trade secrets fraud, unjust enrichment, intentional interference with contractual and prospective business relationships, and civil conspiracy.[6] These claims arise from

---

[6] Three notes regarding this list: *First,* Alliant also alleges a tort claim—against McCoy only—for fraudulent inducement. That claim, however, is based on the same transaction that underlies Alliant's breach-of-contract claim against McCoy. Accordingly, it will be analyzed in the next
(Continued)

the factual core summarized above—namely that while serving as general manager of Alliant's Virginia operations, McCoy embezzled company funds, committed fraud, converted bank accounts, misappropriated trade secrets, diverted payments and merchant relationships to himself or his affiliated entities, miscoded personal expenses as business expenses, and failed to complete critical work assignments.

Under the Ninth Circuit's three-part test discussed above, the Court's first task is to determine whether the McCoy Defendants purposefully directed their activities at Idaho. To answer this question, the Court applies yet another three-part test, derived from the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984). *See Picot v. Weston*, 780 F.3d 1206, 1213-14 (9th Cir. 2015). Under this test, a defendant must have (1) committed an intentional act (2) expressly aimed at the forum state, (3) causing harm the defendant knew was likely to be suffered there. *Id.*

---

section, alongside the contract claim. *Second,* civil conspiracy, though alleged as a freestanding claim, is more properly recognized as a theory of liability depending on the commission of an underlying tort. *See Taylor v. McNichols*, 243 P.3d 642, 659 (Idaho 2010); *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1228 (9th Cir. 1997). Accordingly, the Court will apply the purposeful-direction framework to this claim. *Third,* unjust enrichment claims may be predicated on either tort or contract. Alliant alleges an unjust-enrichment claim against all defendants, and for the most part, the claim is predicated on the alleged tortious conduct of all defendants. *See Compl.* ¶¶ 189-91, Dkt. 1. But the unjust-enrichment claim against McCoy is predicated on both contract and tort allegations. *Id.* ¶¶ 184-88 (alleging that McCoy's failure to repay a loan—the same loan forming the basis of the contract claim—would unjustly enrich McCoy). Accordingly, the Court will analyze the unjust enrichment claim in this section and the next.

Here, the McCoy Defendants have committed intentional acts, but Alliant has not shown that these acts were expressly aimed at Idaho. The conduct underpinning the tort claims against these defendants centers on Alliant's Virginia-based operations. The handling of the LPP Accounts, the routing of residual payments, the alleged fraudulent representations, the misappropriation of trade secrets, and the diversion of customer relationships, concern non-Idaho banks and accounts, non-Idaho customers or businesses, and non-Idaho business activity. As the McCoy Defendants aptly note in their brief, the target of the McCoy Defendants' actions "is business on the east coast with the bullseye centered in Virginia." *Response,* Dkt. 32, at 4. Further, assuming that the McCoy Defendants disclosed trade secrets, they made the disclosures from—and directed them to—a state other than Idaho. *See Merchants Retail Partners Mgmt., LLC v. Metcalf,* No. 2:24-cv-00365-SGC, 2025 WL 57714, at *4 (N.D. Ala. Jan. 9, 2025) (Alabama-based employer failed to establish specific jurisdiction over non-resident, remote employee alleged to have disclosed his employer's trade secrets where, among other things, the employee "made the disclosure from, and directed it to, a state other than Alabama," citing *Drayton Enters., L.L.C. v. Dunker,* 142 F. Supp. 2d 1177, 1183-86 (D.N.D. 2001)).

Idaho's main connection to the alleged misconduct is that Alliant is headquartered there. But that is insufficient. As the Supreme Court explained in

*Walden v. Fiore,* 571 U.S. 277, 290 (2014), "mere injury to a forum resident is not a sufficient connection to the forum." Rather, the jurisdictional analysis must focus on the defendant's suit-related contacts with the forum state—not merely the defendant's contacts with a forum resident or the location where the plaintiff experiences the effects of the alleged misconduct. *Id.* at 284-85. In short, mere knowledge that a plaintiff resides in the forum, or that harm will be felt there, does not constitute express aiming. *Id.* at 289-91.

Alliant has not fully reckoned with this principle in its briefing. It argues, contrary to *Walden v. Fiore,* that jurisdiction in an employer's forum state is proper if the nonresident employee "knew that any harm resulting from their misconduct would likely be suffered in the state where their former employer was located." *Response,* Dkt. 30, at 17-18 (string-citing numerous cases).[7]

Granted, some of the alleged misconduct is arguably less Virginia-centric than misconduct directly involving Virginia businesses and bank accounts. For example, McCoy's alleged miscoding of personal expenses as business expenses

---

[7] The Court will not engage in a detailed discussion of the eleven non-binding cases Alliant string-cited in this portion of its brief, though it will observe the following: (1) many of the cases are factually distinguishable; (2) seven were decided before *Walden*; and (3) some post-*Walden* cases nonetheless fail to account for *Walden,* including, for example, *Vizant Technologies LLC v. Whitchurch*, 97 F. Supp. 3d 618 (E.D. Pa. 2015). *See Cruz v. Segura,* 2021 WL 12299227, at *8 (M.D. Fla. Aug. 7, 2021) (finding *Vizant* to be unpersuasive, concluding that its reasoning was "in direct contravention of *Walden*").

does not involve third-party assets or businesses located in Virginia. Still, though, during his entire tenure with Alliant, McCoy worked out of Alliant's Virginia office, managing Virginia operations. Seen in that light, McCoy's miscoding of personal expenses, as well as other misconduct not directly involving Virginia businesses or bank accounts, is best understood as occurring where McCoy worked and where the operations he managed were centered—Virginia. And as will be discussed below, McCoy's annual trips to Idaho, his alleged "regular contact" with Eisenman, and the fact that his salary payments were processed through an Idaho bank do not alter this conclusion.

In sum, Alliant has failed to demonstrate that the McCoy Defendants purposefully directed their conduct at Idaho. Even assuming, however, that the McCoy Defendants had purposefully directed their conduct at Idaho, Alliant has not demonstrated that the tort claims against these defendants "arise out of or relate to" their forum-related activities. *Schwarzenegger*, 374 F.3d at 802. As already explained, each tort claim arises from alleged misconduct centered in Virginia. Those claims would exist regardless of McCoy's limited contacts with Idaho, such as his employment by an Idaho-headquartered company or his occasional travel to Idaho for company events. *See TorcUp Inc. v. Aztec Bolting Servs., Inc.,* 386 F. Supp. 3d 520, 526-27 (E.D. Pa. 2019) (holding that a Pennsylvania-based employer failed to establish specific jurisdiction over Texas sales representative

who allegedly misappropriated a Texas customer list).

For all these reasons, the Court will grant the McCoy Defendants' motion to dismiss the tort claims alleged in Counts 1, 2, 3, 4, 5, 8, 10, 11, and 12.[8]

### 2. Claims Related to the Loan Transaction

The Court will also dismiss the contract and contract-related claims alleged against McCoy in Counts 6, 7, and 9. In Count 6, Alliant alleges that McCoy breached "an implied contract for money lent." *Compl.* at 36, Dkt. 1. The alleged transaction involves Alliant's advance of $103,000 to McCoy. In Counts 7 and 9, Alliant alleges fraudulent inducement and unjust enrichment based on the same transaction.

Contract claims are generally analyzed under the purposeful-availment framework. The inquiry asks whether the defendant "purposefully availed himself of the privilege of conducting activities within the forum State," thereby invoking the benefits and protections of its laws. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Relevant considerations include the parties' prior negotiations, the contemplated future consequences of the agreement, and the parties' actual course of dealing. *Id.* at 479.

---

[8] Because Alliant did not make a prima facie showing on the second prong (purposeful direction or availment), the Court need not reach the reasonableness analysis. The same is true with respect to the other moving defendants. Accordingly, the Court will not address any of the parties' "reasonableness" arguments.

Those considerations do not support jurisdiction here. First, the mere act of contracting with an Idaho-based plaintiff is not enough to constitute purposeful availment. *See Burger King,* 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."). Second, the transaction at issue involved Alliant advancing funds so McCoy could make a down payment on a residence located outside Idaho. The alleged agreement did not require performance in Idaho, did not involve Idaho property or collateral, and did not contemplate an ongoing, Idaho-centered contractual relationship. Third, although the loan transaction arose in the context of McCoy's employment relationship with Alliant, that relationship does not demonstrate that McCoy purposefully availed himself of the privilege of conducting activities in Idaho.

Regarding that third point, courts have reached differing conclusions in deciding whether remote employees purposefully avail themselves of the privilege of conducting activities in the forum state when they accept a job with an out-of-state employer.[9] When deciding this issue, courts have examined a variety of

---

[9] *Compare, e.g., TorcUp Inc. v. Aztec Bolting Servs., Inc.*, 386 F. Supp. 3d 520, 523-24 (E.D. Pa. 2019) (Pennsylvania-based employer failed to establish specific jurisdiction over Texas (Continued)

factors, including: (1) whether the employee proactively sought a position with the employer; (2) whether the employee held himself out to be a resident of the state where the employer is based; (3) the length of the employment relationship; (4) the extent and nature of the employee's travel to where the employer is based; (5) whether the employee's business responsibilities include clients or customers in the forum state; and (6) the frequency of the employee's communications with colleagues in that state. *See Merchants Retail Partners Mgmt., LLC v. Metcalf*, No. 2:24-cv-00365-SGC, 2025 WL 57714 (N.D. Ala. Jan. 9, 2025) (citing cases).

Here, the facts before the Court do not support exercising personal jurisdiction over McCoy based on the underlying employment relationship. Although McCoy has worked for Alliant since 2013, he worked exclusively out of its Virginia office during his tenure with the company, primarily handling and supervising non-Idaho accounts. He did not proactively seek out employment with an Idaho-based employer or hold himself out to be an Idaho resident; rather he

---

sales representative who allegedly misappropriated a Texas customer list) *and Merchants Retail Partners Mgmt., LLC v. Metcalf,* No. 2:24-cv-00365-SGC, 2025 WL 57714, at *5 (N.D. Ala. Jan. 9, 2025) (Alabama-based employer failed to establish specific jurisdiction over Metcalf, an employee working remotely from Utah; observing that "the fact that Metcalf worked for entities based in Alabama, standing alone, does not constitute purposeful availment") *with M3 USA Corp. v. Hart*, 516 F. Supp. 3d 476 (E.D. Pa. 2021) (Pennsylvania-based employer established specific jurisdiction over non-resident defendant who worked remotely New Jersey where, among other things, the employee marketed herself as a Pennsylvania resident when applying for the job).

became an Alliant employee due to an acquisition. *See Ncontracts, LLC v. Holmberg*, 2022 WL 17724148, at *6-10 (M.D. Tenn. Dec. 15, 2022) (declining to exercise personal jurisdiction over non-resident defendant who worked remotely for Tennessee-based employer where, among other things, the defendant became employed by the company due to an acquisition). His work-related trips to Idaho were infrequent (once per year)—typically involving one day of work-related activities and one day of social events. *See id.* (declining to exercise personal jurisdiction over a non-resident, remote employee who, during his 18 months of employment, traveled to the forum twice for training sessions, totaling 10 days). As another court has observed, while an employer may choose to bring its remote employees into the forum for training, "it does not thereby stick its employees with the consequences of the 'purposeful availment' of the privilege of acting in … [the forum state] for personal jurisdiction purposes. *Id.* at 8; *see also TorcUp,* 386 F. Supp. 3d at 527 (remote employee's attendance at a four-day training session in the forum was "too attenuated of a contact to establish personal jurisdiction"). And while Alliant alleges that its sole member, Michael Eisman, had "regular contact" with McCoy, no details are provided regarding the specific frequency, duration, or topics discussed during these contacts. Finally, although McCoy's paychecks were drawn from an Idaho bank, merely receiving payment from a forum state does not create a substantial connection with the state.

In sum, considering all these factors, the underlying employment relationship between Alliant and McCoy does not demonstrate that McCoy purposefully availed himself of the privilege of conducting activities in Idaho. Said differently, McCoy's contacts with Idaho do not exist because he was seeking to further his business in Idaho. They exist simply because Alliant happens to be headquartered in Idaho. The Court will therefore decline to exercise jurisdiction over McCoy with respect to the contract claims arising from the $103,000 loan transaction. (These claims include Count 6, for breach of implied contract and Count 9, for unjust enrichment.)

For similar reasons, the Court will dismiss Count 7—the fraudulent inducement claim related to the loan transaction. Here, Alliant alleges that McCoy knowingly made false material representations to induce Alliant to lend him $103,000. But these misrepresentations concerned McCoy's purchase of out-of-forum property, and they do not support a finding that McCoy expressly aimed his conduct at Idaho, or that he purposefully availed himself of the privilege of conducting activities in Idaho.

## C.    Evans's and Lapole's Motions to Dismiss

The Court next considers Evans's and Lapole's separately filed motions to dismiss. Alliant alleges the same claims against Evans and Lapole: breach of fiduciary duty; misappropriation of trade secrets under Idaho and federal law;

unjust enrichment; intentional interference with contracts and prospective business expectancy; and civil conspiracy.

The factual allegations against Lapole concern alleged misconduct both during and after his employment. Alliant allege that Lapole assisted in Esty's misconduct while he was employed with the company. In terms of post-termination conduct, Alliant alleges that he disclosed Alliant's proprietary and confidential information and acted in concert with Milton and Tracer to solicit and divert Alliant's merchants. Lapole also allegedly removed or retained Alliant-owned point-of-sale equipment. *Compl*. ¶¶ 111–15, Dkt. 1.

The allegations against Evans are more limited and largely derivative of McCoy's alleged misconduct. Alliant alleges that Evans, who also worked in Alliant's Virginia office,[10] failed to report his father's alleged misconduct and assisted that misconduct by accessing non-Alliant online accounts associated with McCoy's separate business to facilitate the diversion of customers and to conceal those activities. *Id.* ¶¶ 102–104.

Because the claims against Lapole and Evans sound in tort, the Court applies the purposeful-direction framework. The analysis for these defendants will largely

---

[10] Evans initially worked in the Virginia office, but during the COVID-19 pandemic, Alliant's Virginia office moved to having its employes work remotely. Accordingly, from 2020 to 2024, Evans worked from his home in West Virginia. *See Evans Dec.* ¶¶ 11-12, Dkt. 27-2.

track the analysis appliable to McCoy. That is, as with McCoy, Alliant has alleged intentional acts, but it failed to show that either Evans or Lapole expressly aimed their conduct at Idaho. Rather, the misconduct occurred outside Idaho for the reasons explained above. Alliant's residence in Idaho, the fact that it allegedly felt the effects of the conduct there, each defendant's limited travel to Idaho for employer-directed trainings or retreats, and the fact that their compensation was paid through an Idaho bank do not establish purposeful direction. Accordingly, the Court will grant Evans's and Lapole's motions to dismiss.

**D.     Milton and Tracer's Motion to Dismiss**

The Court will also grant Defendant Christy Milton and Tracer Payments, LLC's motion to dismiss. Alliant alleges the following claims against these defendants: misappropriation of trade secrets under Idaho and federal law; unjust enrichment; intentional interference with contracts and prospective business expectancy; and civil conspiracy. Each claim sounds in tort or is derivative of alleged tortious conduct.

The claims against Milton and Tracer arise primarily from Lapole's post-termination conduct, which was described earlier. To reiterate: Tracer hired Lapole after Alliant fired him, and Lapole allegedly disclosed "Alliant Proprietary Information" to Milton and Tracer. Tracer did not hire Lapole as a member of its sales team; rather he is employed in a support role and does not solicit clients.

*Lapole Dec.* ¶ 5, Dkt. 28-2. Even so, Alliant alleges that Milton and Tracer—

"acting in concert with" Lapole—diverted Idaho merchants away from Alliant. *See*

*Compl.* ¶¶ 19, 21, 114–15, Dkt. 1.

Beyond these general allegations, the complaint provides little factual detail

regarding Milton's or Tracer's conduct. For example, Alliant does not identify any

specific merchant these defendants allegedly solicited or diverted, nor does it detail

any specific communications related to such conduct.[11] *See generally Swartz v.*

*KPMG LLP,* 476 F.3d 756, 766 (9th Cir. 2007) ("mere 'bare bones' assertions of

minimum contacts with the forum or legal conclusions unsupported by specific

factual allegations will not satisfy a plaintiff's pleading burden").

Applying the purposeful-direction framework, Alliant has adequately

alleged intentional acts. But it has failed to show that Milton and Tracer expressly

aimed their conduct at Idaho. The alleged disclosure of trade secrets—the central

act underpinning the claims against Milton and Tracer—was allegedly made by

Lapole from a state other than Idaho and received by Milton and Tracer in Texas.

---

[11] In a December 11, 2024 demand letter to Milton, Alliant's counsel indicated that the merchants allegedly diverted included, but were not limited to, Foreign Auto Services, Bruckner Trucks, and Parva Plastic Surgery. *Dec. 11, 2024 Letter to Milton,* Dkt. 39-2. None of these merchants were identified as Idaho merchants. More broadly, in responding to the motion filed against him, Defendant Gage Evans declared that "Alliant has customers located all throughout the United States, with the majority in or around the East Coast or Washington, DC Area. Approximately less than five percent (5.00%) of Alliant's customers are located in Idaho." *Evans Dec.* ¶ 7, Dkt. 27-2.

There is no allegation that this disclosure, or any related solicitation, occurred in Idaho or was directed into Idaho. The fact that Alliant may have experienced downstream harm in Idaho from this disclosure does not establish express aiming. *See Merchants Retail,* 2025 WL 57714, at *4 (no personal jurisdiction where alleged disclosure by remote employee was made from, and directed to, a state other than the forum); *Drayton Enters., L.L.C. v. Dunker,* 142 F. Supp. 2d 1177, 1183–86 (D.N.D. 2001). Rather, under *Walden v. Fiore*, 571 U.S. 277 (2014), personal jurisdiction cannot be based on the plaintiff's residence or the location where the plaintiff feels the effects of allegedly tortious conduct. The analysis must instead focus on the defendants' suit-related contacts with the forum. Here, Idaho's connection to the alleged misconduct is that Alliant is headquartered there. That connection is insufficient. *See generally Guaranteed Rate v. Conn*, 264 F. Supp. 3d 909, 917 (N.D. Ill. 2017) (observing that in most cases where personal jurisdiction is upheld in a "business tort context," courts conclude that personal jurisdiction exists "only where the defendant had some direct contact with the forum").

Alliant's efforts to establish jurisdiction via the Independent Associate Agreement (IAA) between Tracer and CenPos Direct, LLC are unavailing. As noted above, Tracer entered into the IAA with CenPos Direct, LLC in 2013, and Alliant later assumed CenPos's rights and obligations. The IAA, which contains an Idaho choice-of-law provision and forum-selection provision, memorializes a

referral agreement whereby Tracer agreed to refer merchants to CenPos if Tracer "reasonably believes" the merchants "may benefit and/or be interested in CenPos's product offering." *IAA* ¶ 1, Dkt. 39-2 at ECF 7.  Based on the existence of this contractual relationship, Alliant alleges that Milton had a longstanding business relationship with Alliant; that she knew Eisenman resided in Idaho; that she had "regular contact" with Eisenman; and that she "regularly received payments" from an Idaho entity. *Compl.* ¶ 21, Dkt. 1

But Alliant does not allege that Tracer breached the IAA. Nor has it brought claims that require enforcing or interpreting the IAA. Rather, Tracer and Milton's alleged misconduct at issue in this lawsuit relates to Lapole's delivery of proprietary information to Tracer and Milton and the use of that information to solicit Alliant merchants. Moreover, Milton points out that Alliant lost access to the CenPos platform in 2023 in any event—before Milton and Tracer's alleged misconduct at issue here. *See Milton Dec.* ¶ 8, Dkt. 38-1 ("In the fall of 2023, Alliant lost access to the CenPos platform."). The IAA, then, does not supply the necessary suit-related, Idaho-directed contacts to support jurisdiction over the tort claims alleged against Milton and Tracer.

Likewise, Alliant's reference to Milton's affiliation with "CoCard" does not advance its jurisdictional arguments. On this point, Alliant says Milton and Tracer "appear to have other contacts with the Idaho forum beyond their business

relationship with Alliant." *Response,* Dkt. 38, at 2. Specifically, Alliant notes that Milton's LinkedIn profile identifies her as a "Managing Partner" of a business entity known as CoCard, and that, according to the Idaho Secretary of State, "an entity named 'CoCard Idaho' is listed as 'Active-Current.'" *Id.* In response, Milton submitted a supplemental declaration explaining that she does not have any ownership interest in the entity registered as CoCard Idaho. *Milton Supp. Dec.* ¶ 9, Dkt. 44. She further explains that CoCard is a "payment processing cooperative—a group of ISO's [independent sales offices] who band together to get better pricing and services from processors and banks." *Id.* ¶ 3. Each ISO is operated individually under a shared "CoCard" umbrella, without "territory-based branches." *Id.* Thus, Milton's "management of CoCard in Texas, serves merchants in Texas." *Id.* ¶ 6.

On this record, Alliant's reference to CoCard Idaho does not support jurisdiction. As a threshold matter, Alliant has conceded that this Court does not have *general* jurisdiction over Milton and Tracer; only specific jurisdiction is at issue. *See Response,* Dkt. 39, at 5. As such, the CoCard references—which Alliant raised to show that Milton and Tracer might have "*other contacts* with the Idaho forum *beyond their business relationship with Alliant*"—are not relevant. *Response*, Dkt. 38, at 2 (emphasis added). Specific jurisdiction focuses on suit-related contacts. *See generally Walden*, 571 U.S. at 284 (explaining that specific jurisdiction arises from the relationship among the defendant, the forum, and the

litigation). Plus, the CoCard references ultimately do not add anything to the factual allegations in the complaint.

In sum, because Alliant has not established that Milton or Tracer purposefully directed tortious conduct at Idaho, or that the claims against them arise out of or relate to Idaho-directed activity, the Court will grant their motion to dismiss for lack of personal jurisdiction.

## E.    Transfer of Action

Having concluded that personal jurisdiction does not exist over any of the defendants, the Court will consider whether it should transfer this action in lieu of dismissing it without prejudice. In 28 U.S.C. § 1631, courts are given the following directive:

> Whenever a civil action is filed . . . and the court finds that there is want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action … to any other such court ... in which the action … could have been brought at the time it was filed . . . .

28 U.S.C. § 1631. Although the decision whether to transfer the case "in the interest of justice" lies within district court's discretion, "[g]enerally, the transfer of a case is favored over dismissal because a transfer facilitates an adjudication on the merits of the dispute at issue." *See Burrell v. Concept AG, LLC,* 2019 WL 12762540, at *14 (W.D. Tenn. Aug. 23, 2019).

Ordinarily, this Court would be inclined to transfer this matter to the Eastern District of Virginia, particularly given Alliant's pending motion for a preliminary

injunction. And the Court would do precisely that if the McCoy Defendants were the only named defendants. But Alliant has not requested a transfer in lieu of dismissal—to the Eastern District of Virginia or anywhere else—so the issue has not been briefed. Plus, complicating factors counsel against transfer.

Most significantly, this case involves multiple defendants located in multiple states, and they do not agree as to where jurisdiction lies. Defendant Lapole contends that the claims against him should be resolved in Washington, given the choice-of-law and forum-selection provisions in the Non-Competition and Non-Disclosure Agreement. *See* Dkt. 28-1, at 9 (arguing that the claims against Lapole "should be dismissed, or, at a minimum, transferred to the Western District of Washington"). Two other defendants—Christy Milton and Tracer Payments, LLC—are located in Texas. And although they argue that Alliant's "grievances center entirely on alleged actions that occurred (or continue to occur) in Virginia," *Motion,* Dkt. 43, at 2, they have not explicitly stated that the suit ought to have been filed in Virginia. Under these circumstances, and on the briefing record before it, the Court finds it appropriate to dismiss this matter without prejudice, having determined that jurisdiction in the District of Idaho is lacking.

Finally, the Court notes the resolution of Alliant's pending request for injunctive relief will unfortunately be delayed. This Court lacks jurisdiction and therefore cannot address the motion. The Court recognizes that the lapse of time

between the request for injunctive relief and the issuance of this decision was lengthy. But the Court required time to consider and resolve the four separate motions to dismiss, each of which raised unique issues. Additionally, Alliant chose to seek an injunction in its preferred jurisdiction, despite knowing that all defendants contested jurisdiction. As another court observed in a similar setting, "[t]he best way for a plaintiff to avoid a delay in the consideration of a motion for TRO pending resolution of a serious challenge to personal jurisdiction is to play it safe by filing in a forum that clearly has personal jurisdiction." *Ncontracts,* 2022 WL 17724148, at *10 n.16. Here, "Plaintiff made a choice to file in the jurisdiction that it preferred, not the jurisdiction that was safer from a personal-jurisdiction standpoint. That is not say that this was a bad choice, but it is to say that it was a choice that imperiled the promptness of the ruling on the motion for TRO." *Id.*

## ORDER

**IT IS ORDERED that:**

1. Defendants John Esty McCoy, Fluid Charge, LLC, and Leesburg Pike Partners, LLC (Maryland)'s Motion to Dismiss (Dkt. 26) is **GRANTED.**

2. Defendant Gage Evans' Motion to Dismiss (Dkt. 27) is **GRANTED.**

3. Defendant Zach Lapole's Motion to Dismiss (Dk. 28) is **GRANTED.**

4. Defendants Christy Milton and Tracer Payments' Motion to Dismiss (Dkt. 38) is **GRANTED.**

5.  All claims are **DISMISSED WITHOUT PREJUDICE.**

6. The pending Motion for a Preliminary Injunction (Dkt. 47) is **DEEMED MOOT.**

7. The Court will enter judgment separately.

DATED: January 2, 2026

B. Lynn Winmill
U.S. District Court Judge